IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

UNITED STATES OF AMERICA

    v.                                   **CRIMINAL NO. 4:16cr60**

ROSCOE LEE SIMPSON, JR.,

    **and**

WILLIAM WHITE,

    **Defendants.**

### <u>OPINION AND ORDER</u>

This matter comes before the Court upon William White's ("Defendant") Motion to Suppress Evidence Due to Lack of Probable Cause for Arrest and to Produce (styled as "Defendant's Motion to Suppress All Evidence Obtained in Connection with the Arrest of the Defendant On or About August 24, 2016"), ECF No. 30, and Motion to Suppress Defendant's Statements, ECF No. 31. For the reasons set forth herein and explained at the November 16, 2016 hearing on these Motions, Defendant's Motion to Suppress Evidence Due to Lack of Probable Cause for Arrest and to Produce is **DENIED** as to the Motion to Suppress Evidence and **GRANTED** as to the Motion to Produce. ECF No. 30. Defendant's Motion to Suppress Defendant's Statements is **DENIED**. ECF No. 31.

### I.    PROCEDURAL BACKGROUND

On September 12, 2016, William White ("Defendant") was named in a three-count Superseding Indictment. Defendant was charged with Conspiracy to Possess with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 846 (Count One), and Interstate Transportation in Aid of Racketeering Enterprises, in violation of 18 U.S.C. § 1952(a)(3) (Count Three). ECF No.

1

18. Defendant's co-defendant, Roscoe Lee Simpson, was also charged with Count One, as well as Possession with Intent to Distribute Cocaine, in violation of 18 U.S.C. § 841 (Count Two). Id.

Defendant submitted four Motions on October 13, 2016: (1) Motion for Bill of Particulars, ECF No. 29; (2) Motion to Suppress Evidence Due to Lack of Probable Cause for Arrest and to Produce (styled as "Motion to Suppress All Evidence Obtained in Connection with the Arrest of the Defendant On or About August 24, 2016"), ECF No. 30; (3) Motion to Suppress Defendant's Statements, ECF No. 31; and (4) Motion to Sever Defendant, ECF No. 32. The Government filed a response on October 28, 2016. ECF No. 35. The Court denied the Motion for Bill of Particulars and Motion to Sever Defendant on November 7, 2016. ECF No. 37. On November 16, 2016, the Court held a hearing regarding the two Motions to Suppress. ECF No. 39.

## II.    FACTUAL BACKGROUND

The following summary is provided by way of background. The basic details of the investigation are not in dispute. Most of the information summarized here has been drawn from the evidence presented at the November 16, 2016 suppression hearing, including the testimony of Department of Homeland Security Special Agent John Slayton, Virginia State Police Agent Peter Gallaccio, and the summary of the telephone conversations between the co-defendants provided by the Defendant. See Hr'g Tr., ECF No. 40; Ex. 2. Additional details undisputed by the parties in their briefing are included to fill out the narrative.

On July 18, 2016, a team comprised of agents from the Department of Homeland Security and Virginia State Police conducting an investigation into cocaine distributors observed an individual named David Rush entering a storage unit. Hr'g Tr., ECF No. 40, at 7. Mr. Rush entered the storage unit empty-handed, then returned to his vehicle shortly thereafter with a bag in his hand. After agents approached Mr. Rush, he agreed to cooperate and told them that the bag

2

contained drugs, which the investigative team later determined to be forty-eight ounces of cocaine. Id. at 8–9. Mr. Rush also stated he had a firearm and a large sum of currency at his residence, which the agents then collected from his residence. He identified his source of supply as Roscoe Simpson, the co-defendant in this matter, and stated that he expected to hear from Mr. Simpson regarding $120,000 he owed Mr. Simpson for a previous shipment of cocaine. He explained he also expected to meet Mr. Simpson to receive another two to three kilograms of cocaine. Id. at 9.

The investigative team set up a meeting between Mr. Rush and Mr. Simpson. For the meeting, agents supplied Mr. Rush with $66,000 repackaged to appear as if it were $120,000. While the team was surveilling the meeting, agents observed Mr. Simpson leaving at one point to enter a storage facility to deposit the repackaged $66,000 and obtain three kilograms of cocaine to give to Mr. Rush. Id. at 10. The team then approached Mr. Simpson, who agreed to cooperate. Agents also obtained a search warrant for the storage unit and recovered an additional half kilogram of cocaine, as well as the repackaged $66,000. Id. at 10–11.

Statements made by Mr. Simpson after he had received a Miranda warning indicate that since January 2016, Mr. Simpson and his associates had been responsible for the importation and distribution of approximately fifty kilograms of cocaine into the area encompassing both the Newport News and Norfolk Divisions of the Eastern District of Virginia. Mr. Simpson was detained on a federal arrest warrant and transported to the Western Tidewater Regional Jail ("WTRJ"). ECF No. 35, at 2.

At the WTRJ, all individuals at the facility are notified prior to any calls that their conversations are subject to monitoring and recording. As the result of Mr. Simpson's detention in the WTRJ, the investigative team was able to listen to Mr. Simpson's recorded telephone

3

conversations. Id. at 11. On July 24, 2016, Mr. Simpson called, via a WTRJ telephone, an individual later identified as the Defendant. During the call, the investigative team learned the Defendant would be visiting Mr. Simpson at the WTRJ on July 27, 2016, Mr. Simpson's assigned visitation day. Mr. Simpson informed Defendant he had been "set up all the way and the guy put me in a position that I was with everything." Defendant replied, "OK," then told Mr. Simpson he wanted to talk to Mr. Simpson by himself (that is, during jail visitation) without Mr. Simpson's mother, who was also planning on attending the visitation, present. Ex. 2, at 1.

Mr. Simpson also told Defendant that while he was in the area visiting, he would need Defendant to go to the residence of an individual named "Light Skin," later identified as Walter Peyton (also called "Cuzzo"). The Defendant replied, "I don't remember how to get there. I need that number." The two also discussed Defendant making contact with "Manny" and Defendant being "able to find a little bit on the book" by finding an individual named Gloria Rainey. Id.

On July 27, 2016, the investigative team conducted surveillance at the jail. The team observed the Defendant meet with Mr. Simpson's mother in the parking lot and then enter the jail by himself. The team then, based on routine WTRJ procedures recording conversations between individuals at the facility and their visitors, listened to the conversation between Mr. Simpson and Defendant. Hr'g Tr., ECF No. 40, at 13–14. Mr. Simpson informed Defendant that he was caught with three and a half bricks; Defendant did not ask for clarification. Id. at 15.

Mr. Simpson also asked Defendant to visit Mr. Peyton. Mr. Simpson gave the Defendant instructions on how to get to Mr. Peyton's residence and "Manny's" residence. During the conversation, Defendant was having difficulty listening to Mr. Simpson and writing down directions; Defendant told Mr. Simpson, "Hold on[,] we got one shot." Mr. Simpson also provided directions to the residences or places of employment for other individuals, after which

.

4

he stated, "My cousin (Peyton) knows about the other ones." Id. at 14. See also Ex. 2, at 1.

The investigative team then observed Defendant leaving WTRJ to drive to Mr. Peyton's residence. While Defendant was driving there, Mr. Simpson called Defendant again; Defendant told Mr. Simpson that someone was following him. Mr. Simpson suggested that Defendant could visit Mr. Peyton at another time, but Defendant stated, "I think I'll still go[] to say hello to [Mr. Peyton]." Ex. 2, at 2.

During this visit, Mr. Simpson again called Defendant, who then handed his telephone to Mr. Peyton. Mr. Simpson and Mr. Peyton proceeded to discuss Mr. Simpson finding an individual (later identified as Richard Taylor); Mr. Simpson being set up; and whether Mr. Simpson wanted Mr. Peyton "to exchange the exchange[d] shit," to which Mr. Simpson replied that Mr. Peyton should just give Defendant "a number and he will give it to me." Id. See also Hr'g Tr., ECF No. 40, at 65.

After continuing surveillance of the residence, the team executed a search warrant of Mr. Peyton's residence, in which they found one kilogram of cocaine. Hr'g Tr., ECF No. 40, at 17. According to Agent Slayton's testimony, the team also spoke with Mr. Peyton, who agreed to cooperate and told the team that the reason for Defendant's visit to his residence was to relay a message from Mr. Simpson that Mr. Peyton should collect money from "Rich Boy" and "Digger." Id. at 18. (Defendant disputes that Mr. Simpson and Defendant ever discussed "Rich Boy" and "Digger" during Defendant's visit to WTRJ. Id. at 67.) Mr. Peyton collected the money, approximately $37,000, which the team then returned in a bag to Mr. Peyton for the purposes of arranging a meeting to have Mr. Peyton hand over the money to the Defendant. Id. at 18–19.

On August 24, 2016, Agent Slayton and approximately eleven other members of the

investigative team waited in the parking lot adjacent the Buffalo Wild Wings in which the Defendant and Mr. Peyton were to meet and observed Defendant arriving around 4:12 PM. Id. at 19–21. They then observed Mr. Peyton walk over to Defendant's vehicle, hand him the bag with the $37,000 that the team had provided, and Defendant place the bag in the vehicle. The two then proceeded into Buffalo Wild Wings. Mr. Peyton later reemerged by himself around 5:35 PM. He opened the trunk, though his back was turned such that agents were unable to observe his actions. Members of the team comprised of Virginia State Police in uniform then approached Defendant and handcuffed him. A member of the investigative team then retrieved the money from the car. Id. at 22–23.

Special Agent Slayton, who was in plain clothes and carried a firearm and badge, then approached Defendant. Special Agent Slayton placed Defendant in the front passenger seat of Special Agent Slayton's sports utility vehicle. Special Agent Slayton sat in the driver's seat, while another special agent from the Department of Homeland Security was in the back seat behind the Defendant. Id. at 23–24. Special Agent Slayton and the other special agent then identified themselves; Defendant also identified himself as a Senior Executive Service member of the Department of Homeland Security. Id. at 29. Special Agent Slayton then advised Defendant of his Miranda rights and that he was not under arrest and free to leave at any time. Id. at 24. Defendant said he was willing to talk to agents and assist in any way possible. Id. The other special agent then exited the vehicle and removed the handcuffs on Defendant. Id.

Upon Special Agent Slayton's questioning, Defendant advised that he was collecting money for Mr. Simpson for attorney's fees and bail. Id. at 25. Special Agent Slayton then advised Defendant that he would be moving the vehicle in which they sat from the area in the parking lot adjacent to the Buffalo Wild Wings to the area adjacent to Gianna's Pizzeria, across

6

the parking lot, in order to avoid the number of individuals gathering in the area for dinnertime. Special Agent Slayton inquired as to whether Defendant would assent to having one of the agents drive Defendant's vehicle to that same area across the parking lot, to which Defendant agreed. Id.

During the remainder of the questioning, Special Agent Slayton asked Defendant about the purpose of his visit to Mr. Simpson, to which Defendant replied that Mr. Simpson had asked him to go visit Mr. Simpson's cousin and collect money that was owed to him. Id. at 26. Defendant clarified he knew that Mr. Simpson did not have a job. Id. at 27. When Special Agent Slayton inquired about the conversation in which Mr. Simpson stated he had been caught with three and a half bricks, Defendant agreed that the conversation took place. Id. Special Agent Slayton also advised Defendant that "he was in a bad situation," to which Defendant responded by stating that he felt Mr. Simpson had placed him in a "bad situation" by asking him to collect the money from Mr. Peyton. Id.

During the length of the interview, Defendant remained in the same seat. Special Agent Slayton also testified that Defendant did not appear intoxicated, that the conversation did not become heated at any point (though Special Agent Slayton did say, "Come on, man. We're both grown fucking adults here," id. at 55), and that Defendant maintained a calm demeanor throughout. Id. at 28. After approximately one hour and fifteen minutes of questioning, Defendant was released, put his belongings in his vehicle, and left in his vehicle. Id. at 28, 31.

## III.   DEFENDANT'S MOTION TO SUPPRESS EVIDENCE DUE TO LACK OF PROBABLE CAUSE FOR ARREST AND TO PRODUCE

Defendant asks the Court to suppress any evidence stemming from the August 24, 2016 arrest of Defendant due to lack of probable cause for the arrest. ECF No. 3. See also Hr'g Tr., ECF No. 40, at 43.

7

At the hearing, the Parties disputed whether Defendant was arrested on August 24, 2016, and, if Defendant was arrested, whether there was probable cause to arrest Defendant. Thus, as a threshold matter, this Court must first determine whether Defendant was under arrest during the August 24, 2016 encounter with the investigative team. If he was, this Court must then determine whether there was probable cause sufficient to support his arrest.

### A. ARREST

#### 1. Standard of Review

A warrantless arrest is constitutionally permissible if there is probable cause for the arresting officers to believe that a felony is being or has been committed by the arrested individual (here, involvement in the conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846). United States v. McCraw, 920 F.2d 224, 227 (4th Cir. 1990). See also Figg v. Schroeder, 312 F.3d 625, 636 (2002) (describing such warrantless arrests as the defendant being "seized"); Park v. Shiflett, 250 F.3d 843, 850 (4th Cir. 2001) (describing such warrantless arrests as the defendant being "in custody").

The test for determining whether an individual is under a warrantless arrest is whether, under the totality of the circumstances, the individual's freedom of action is curtailed to a degree associated with formal arrest. Park v. Shiflett, 250 F.3d 843 (4th Cir. 2001). See also Miranda v. Arizona, 384 U.S. 436, 444 (1966) (noting a custodial interrogation occurs when there is "questioning initiated by law enforcement officers after a person has been taken into custody or deprived of his freedom of action in a significant way").

The determination of when a defendant is in custody is "objective" and focuses on "how a reasonable man in the suspect's position would have understood his situation." Davis v. Allsbrooks, 778 F.2d 168, 171 (4th Cir. 1985) (internal citations and quotations omitted). See also Berkemer v. McCarthy, 468 U.S. 420, 442 (1984) ("In the absence of formal arrest, the trial

8

court must determine whether a suspect's freedom of movement was sufficiently curtailed by considering how a reasonable man in the suspect's position would have understood his situation." (internal quotation omitted)).

In United States v. Colonna, 511 F.3d 431, 436 (4th Cir. 2007), the Fourth Circuit determined coercive pressures existed to create a custodial interrogation because the defendant's interrogation occurred in a police-dominated environment where the agents did everything to make the defendant, or any reasonable person, believe that he was not free to leave. This included: inundating the defendant's house with over twenty-three federal agents; kicking open the defendant's door and awakening the defendant at gunpoint; constant monitoring of the defendant's family; questioning the defendant in a law enforcement vehicle, during which the defendant was bracketed by two agents whose weapons were drawn; a three-hour interview; and guarding the defendant at all times, including while he was on cigarette breaks. The defendant was also never told he was free to leave or did not have to respond to questions.

By contrast, in United States v. Uzenski, 434 F.3d 690, 704 (4th Cir. 2006), the Fourth Circuit concluded the defendant was not subject to custodial interrogation because he was offered refreshments, allowed to leave the questioning room to use the bathroom, the door to the room in which he was being questioned was partially left open, there was no evidence of forceful restraint, and defendant was told he was not under arrest.

## 2. Defendant's Argument and Government's Response

Government and Defendant dispute whether Defendant was under arrest or in a custodial interrogation warranting a Miranda warning. Defendant argues that the Defendant was placed in a custodial situation because of number of factors speaking to arrest characterized his August 24, 2016 encounter with the investigative team: (1) Defendant was handcuffed; (2) Defendant was approached by several uniformed officers, at least one of whom, Agent Slayton, had his weapon;

9

(3) Defendant was placed in a government vehicle, in which the doors shut, with two agents; (4) his handcuffs were only removed after he was informed of his Miranda rights, informed he was not under arrest, and agreed to cooperate; and (5) the vehicle was moved. ECF No. 40, at 68–69.

Government argues Defendant was not under arrest because (1) the Defendant "was detained initially as [the agents] seized the money," "not placed under arrest"; (2) the Defendant was advised that he was not under arrest and that he was free to leave at any time; (3) the interview took place in a well-lit government vehicle; (4) and the Defendant left after discussing the matter with the agents, rather than being further detained. ECF No. 35, at 4; Hr'g Tr., ECF No. 40, at 44.

### 3. Analysis

Many of the aspects of Defendant's encounter with the investigative team on August 24, 2016 indicate a restraint on Defendant's freedom of movement in a manner associated with a formal arrest. First, Defendant's arrest occurred in the presence of approximately twelve federal and state agents. Second, Defendant was initially placed in handcuffs, which were removed only after Defendant was advised of his Miranda rights and agreed to cooperate with the investigating agents. Third, similar to the situation in Colonna, Defendant was placed in a law enforcement vehicle, with the doors closed, and bookended by two agents, at least one of whom had his firearm (though it was not drawn); such an environment for questioning is particularly restrictive and thus speaks strongly to informal arrest. Finally, Defendant was moved across the parking lot in the law enforcement vehicle, and did not have access to his own vehicle during this time. Upon review of these facts, the Court finds it difficult to see how a reasonable person in Defendant's position would have felt free to leave.

As countervailing considerations, Defendant was advised (as in Uzenski) he was not under arrest. He was also advised he was free to leave at any time. In addition, Defendant was

10

not subject to an extended period of questioning. However, the other circumstances discussed above inform a finding of coercive pressures such that a reasonable individual in Defendant's situation would not have felt free to leave. Thus, the Court **FINDS** that the Defendant was under arrest during the August 24, 2016 encounter. The Court now turns to a consideration of whether probable cause for the arrest existed.

### B. PROBABLE CAUSE FOR ARREST

#### 1. Standard of Review

A warrantless arrest is permitted under the Fourth Amendment when "the arresting officers possess probable cause to believe that the person has committed or is committing a felony offense." United States v. Al-Talib, 55 F.3d 923, 931 (4th Cir. 1995) (citing United States v. Watson, 423 U.S. 411, 422 (1976)). See also United States v. McCraw, 920 F.2d 224, 227 (4th Cir. 1990).

Probable cause justifying an arrest under the Fourth Amendment is subjective, established by facts and circumstances within the officer's knowledge which would warrant the belief of a prudent person that the arrestee had committed or was committing an offense. In assessing whether probable cause exists, courts examine the totality of the circumstances known to the officer at the time of arrest. Al-Talib, 55 F.3d at 931. United States v. Dorlouis, 107 F.3d 248, 255 (4th Cir. 1997), further noted that "probable cause to arrest depends on whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the defendant or defendants had committed an offense." Although probable cause requires "more than a bare suspicion, it requires less than that evidence necessary to convict." United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998) (internal quotations omitted).

In assessing the existence of probable cause, even "seemingly innocent activity" can provide the basis for probable cause when considered in the context of surrounding circumstances. Taylor v. Waters, 81 F.3d 429, 434 (4th Cir. 1996). For example, in Ker v. California, 374 U.S. 23, 36–37 (1963), state law enforcement officers had obtained information sufficient to support probable cause to arrest a husband for marijuana possession. When the officers arrived at his apartment to arrest him, they found his wife there as well and arrested her. Ker held that probable cause existed to arrest her because officers observed a package of marijuana in plain view in the kitchen and knew the apartment had been used as the base of operations for the husband's narcotics activities. Similarly, in Taylor, the Fourth Circuit noted that probable cause existed to arrest the defendant because the arresting officer knew the defendant had lived for years with a confessed narcotics dealer; this dealer was believed to have used the apartment as a base of operations for his drug distribution; utensils commonly used to convert cocaine into cocaine base were in plain view in the kitchen; the defendant demonstrated knowledge of the existence of the utensils; other accessories associated with drug distribution were found in a common area of the apartment; and currency located in the defendant's bedroom and information disclosed in his bank statements were consistent with involvement in a cocaine distribution conspiracy. 81 F.3d 429 at 435.

Furthermore, probable cause can rest on the collective knowledge of the officers or agents involved in an investigation rather than that of the officer who makes the arrest. United States v. Pitt, 382 F.2d 322, 324 (4th Cir. 1967).

### 2. Defendant's Argument and Government's Response

Defendant argues that the agents lacked probable cause to arrest Defendant because the arresting agents lacked information prior to the arrest to support the existence of probable cause. Hr'g Tr., ECF No. 40, at 70. First, Defendant argues that the Government was unable to

demonstrate that Defendant knew specifically that Mr. Peyton was to collect money from "Rich Boy" and "Digger." Rather, Defendant contends, Defendant merely served as a conduit for relaying messages between Mr. Peyton and Mr. Simpson and did not specifically relay any messages concerning the collection of money himself. In support of this, Defendant points out: (1) that Government failed to present any evidence that Defendant knew of what was in the bag Mr. Peyton gave to him or what it would be used for; (2) that the agents in the investigative team were unable to establish from the phone calls that Defendant knew specifically that Mr. Peyton was being asked to collect money from the individuals "Rich Boy" and "Digger" (despite Special Agent Slayton testifying that Mr. Peyton reported that Defendant had provided him with information concerning "Rich Boy" and "Digger" during their meeting on July 27, 2016, id. at 18); (3) that Special Agent Gallaccio, who prepared the summary of the recorded phone calls and conversations between Mr. Simpson and Defendant, was unable to indicate through his summary or from recollection that Defendant knew that Mr. Simpson was owed money by "Rich Boy" or "Digger," id. at 67; and (4) that Defendant handed his phone over to Mr. Peyton while visiting Mr. Peyton so that Mr. Simpson and Mr. Peyton could discuss collection of the funds rather than relaying a message concerning the collection of money himself, id. at 68.

Second, Defendant also argues that none of the known drug distributors in this conspiracy ever provided information about Defendant as being involved in drug distribution, despite agreeing to cooperate with investigating agents and providing details with respect to other individuals involved in distribution. To this point, Defendant argues (1) that Mr. Rush indicated no connection to Defendant and did not name Defendant while cooperating with investigating agents and (2) that Mr. Simpson also did not name Defendant at any point as being involved in his drug distribution ring while cooperating with investigating agents. Id. at 71.

In addition, Defendant also argues that none of his actions indicate that he had any involvement in drug distribution. Defendant advises did not abort his visit to Mr. Peyton even while suspecting someone was following him; that there was no evidence that "Manny," whom Mr. Simpson also asked Defendant to track down, was tied to the drug trafficking; or that Defendant ever offered any open narrative with respect to any involvement in drug distribution during his interview with Special Agent Slayton. Hr'g Tr., ECF 40, at 69–72, 77.

In support of the contention that there was probable cause to arrest Defendant, the Government indicated in its briefing and at the hearing that Defendant's relationship with Mr. Simpson, as evidenced by his conversations and visitation with Mr. Simpson; his understanding of the circumstances surrounding Mr. Simpson's arrest; Mr. Simpson's request that Defendant go see Mr. Peyton regarding collecting money for Mr. Simpson; and his arrangement with Mr. Peyton to pick up the money for Mr. Simpson all point to the existence of probable cause. ECF No. 35, at 2–3.

### 3. Analysis

Upon review of the evidence presented at the hearing, this Court finds that Defendant had every reason to know that Mr. Simpson was a drug distributor and, consequently, that he was picking up money for a drug distributor. Defendant knew Mr. Peyton not have a job and was arrested after being caught with three and a half bricks and/or keys.[1] He was close enough of an associate to know Mr. Simpson's mother and a number of Mr. Simpson's other associates. He was also close enough of an associate to agree to visit a number of Mr. Simpson's associates concerning the funds owed to Mr. Simpson, and to apparently express concern with executing

---

[1] Though Agent Slayton was unable to recall if he knew this prior to his arrest of Defendant, the summary of Defendant's phone calls with Mr. Simpson establishing this was written by another member of the investigative team, Agent Peter Gallaccio with the Virginia State Police. As noted in Pitt, 382 F.2d 322, 324, probable cause can rest on the collective knowledge of the officers or agents involved in an investigation rather than that of the officer who makes the arrest.

the collection successfully on behalf of Mr. Simpson ("Hold on[,] we got one shot."). Thus, Defendant had every reason to know that Mr. Simpson was a drug distributor and that he was picking up money for a drug distributor.

He also knew Mr. Peyton, the individual tasked with collecting the funds for Mr. Simpson, well enough to indicate in his phone calls that he did not "remember" how to get to Mr. Peyton's house, rather than stating he did not "know" how to get to Mr. Peyton's house. He also knew Mr. Peyton well enough to serve as a conduit for Mr. Peyton and Mr. Simpson's telephone conversation. He trusted Mr. Peyton enough to dine with him the evening that he picked up the money and to take the bag of money from Mr. Peyton without checking the contents of the bag. Finally, Mr. Peyton and Mr. Simpson knew Defendant well enough to trust Defendant to just receive "a number" from Mr. Peyton on behalf of Mr. Simpson.

Even if, as Defendant states, he was simply picking up funds for Mr. Simpson's bail bond and attorney's fees, the agents investigating the case had sufficient probable cause to arrest Defendant because of his extremely close ties to Mr. Simpson, whom Defendant knew was a drug distributor; his close knowledge of Mr. Simpson's associates; and his collection of funds on behalf of Mr. Simpson, which Defendant would have known to have been drug debts.

Though each of these activities is arguably innocent, as Defendant claims, in the context of surrounding circumstances, seemingly innocent conduct may support probable cause. Taylor, 81 F.3d 429. Here, in the context of (1) a drug distribution ring, (2) Defendant's knowledge of Mr. Simpson's arrest for drug distribution, (3) Defendant's knowledge of other associates of Mr. Simpson, (4) Defendant's agreement to collect funds on behalf of Mr. Simpson, and (5) the investigative team's collective knowledge of the drug distribution conspiracy they were investigating, Defendant's conduct provided the basis for probable cause. Accordingly, this

Court **FINDS** the arresting officers had probable cause to arrest Defendant on August 24, 2016 and **DENIES** Defendant's Motion to Suppress Evidence Due to Lack of Probable Cause for Arrest and to Produce as to the Motion to Suppress Evidence Due to Lack of Probable Cause for Arrest. ECF No. 30.

### C. DEFENDANT'S 26.2(G) MOTION TO PRODUCE

Pursuant to Fed. R. Crim. P. 26.2(g), Defendant also moves for disclosure of all statements of any witnesses called by the Government at the November 16, 2016 hearing. Fed. R. Crim. P. 26.2 provides:

> **(a) Motion to Produce.** After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

> **(g) Scope.** This rule applies at trial, at a suppression hearing under Rule 12, and to the extent specified in the following rules . . . .

At the hearing, the only witness called by the Government was Special Agent John Slayton. Government presented no objection to the production of Special Agent Slayton's statements. Accordingly, the Court hereby **GRANTS** Defendant's Motion to Produce. ECF No. 30.

## IV. DEFENDANT'S MOTION TO SUPPRESS DEFENDANT'S STATEMENTS

### A. STANDARD OF REVIEW

The Fifth Amendment provides that "[n]o person shall be compelled in any criminal case to be a witness against himself." This protection applies not only to courtroom proceedings, but to out-of-court, custodial interrogations. Miranda, 384 U.S. 436 at 467–68. Under Miranda, statements made during custodial interrogations are admissible only if a defendant is first warned that he or she has the right to remain silent; anything he or she says can and will be used against him or her; that he or she has a right to an attorney; and, if he or she cannot afford an attorney,

one will be provided to him or her. Id. at 444. If, after receiving these warnings, a defendant

invokes his or her right to counsel, interrogation must cease until that defendant is given an

opportunity to confer with an attorney and to have that attorney present during any future

questioning. Id. at 473–74.

The government bears the burden of establishing, by a preponderance of the evidence,

that the defendant was apprised of his or her rights under Miranda, and that the defendant

knowingly, willingly, and voluntarily waived those rights when making a confession. Colorado

v. Connelly, 479 U.S. 157, 168 (1986). Waiver "need not be explicit, but may be inferred from

all the circumstances." United States v. Hicks, 748 F.2d 854, 859 (4th Cir. 1984).

When assessing whether a defendant's waiver of his or her Miranda rights and

subsequent statements were voluntary, a court must look to whether coercive conduct of the

government overbore the will of the defendant or critically impaired his or her capacity for self-

determination in order to make the statement involuntary. Connelly, 479 U.S. at 168; United

States v. Pelton, 835 F.2d 1067, 1071–72 (4th Cir. 1987). To make this determination, the court

must examine a totality of the circumstances surrounding the interview. To this end, 18 U.S.C.A.

§ 3501 provides:

> **(b)** The trial judge in determining the issue of voluntariness shall take into
> consideration all the circumstances surrounding the giving of the confession,
> including:
>
> (1) the time elapsing between arrest and arraignment of the defendant making the
> confession, if it was made after arrest and before arraignment;
> (2) whether such defendant knew the nature of the offense with which he was
> charged or of which he was suspected at the time of making the confession;
> (3) whether or not such defendant was advised or knew that he was not required
> to make any statement and that any such statement could be used against him;
> (4) whether or not such defendant had been advised prior to questioning of his
> right to the assistance of counsel; and
> (5) whether or not such defendant was without the assistance of counsel when

17

questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

However, the circumstances surrounding the interrogation or interview need not be entirely free from intimidation. See, e.g., United States v. Braxton, 112 F.3d 777 at 780–82 (4th Cir. 1997). For example, even drawing a gun or placing a defendant in handcuffs does not necessarily render a defendant's subsequent statement involuntary. See United State v. Elie, 111 F.3d 1135, 1145-46 (1997), abrogated by United States v. Sterling, 283 F.3d 216 (4th Cir. 2002). Furthermore, the existence of a threat or implied promise does not render a confession involuntary; rather, the proper inquiry is whether the confession was "extracted" by the threats or implied promises. Braxton, 112 F.3d at 783.

The moving party—here, the Defendant—bears the burden of production and persuasion in a suppression hearing. However, once the movant has established by a showing of initial facts that a confession was obtained while he or she was under custodial interrogation (as established above), the government then bears the burden of proving by a preponderance of the evidence that the defendant received a Miranda warning and thereafter voluntarily waived his or her privilege against self-incrimination. United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977).

## B.    DISCUSSION

### 1.    Defendant's Argument and Government's Response

Defendant argues that the investigative team's failure to record the Miranda warning is indicative of the team's overall failure to apprise Defendant of his Miranda rights. Furthermore, Defendant argues that even if Defendant was apprised of his Miranda rights, the "psychological pressures brought to bear" demonstrate that any waiver or statements made were involuntary. To this point, Defendant argues that (1) Defendant "was clearly shocked by the circumstances

18

surrounding his arrest" as he had just finished a dinner "during which no conversation of illegal activity occurred" but was immediately thereafter detained in a law enforcement vehicle; (2) the vehicle in which he was being detained was moved; (3) Defendant had "minimal exposure to the criminal justice system"; and (4) that the arresting agents "did use a curse word during the interview." ECF No. 31, at 5; Hr'g Tr., ECF No. 40, at 72.

In response, the Government advises that no recording equipment was available in the law enforcement vehicle on August 24, 2016. ECF No. 35, at 4. The Government also presented the testimony of Special Agent Slayter, who testified that he informed Defendant of his Miranda rights, and that Defendant agreed to speak with and cooperate with the agents. Government further argues that any waiver or statements made were voluntary as the circumstances indicate the Defendant clearly understood his waiver. To this point, Government argues that Defendant is an educated professional who works as an executive at the Department of Homeland Security; on the night of the questioning, Defendant was "cogent, alert[,] and did not appear to be under the influence of any intoxicants"; and Defendant had also undergone a background check "that did not reveal any history of psychiatric or drug abuse." ECF No. 35, at 4.

### 2. Analysis

At the November 16, 2016 suppression hearing, the Government presented the testimony of Special Agent Slayter, whom the Court found to be credible witness; Special Agent Slaytor stated that he informed Defendant of his Miranda rights. Defendant did not offer any testimony or evidence to rebut this. Thus, this Court **FINDS** by a preponderance of the evidence that Defendant was properly informed of his Miranda rights following his arrest on August 2, 2016.

With respect to whether Defendant voluntarily waived his Miranda rights, the Court must consider whether the "coercive conduct of the government overbore the will of the defendant or critically impaired his capacity for self-determination in order to make the statement

19

involuntary." <u>Connelly</u>, 479 U.S. at 168. Altogether, the conduct of the government and the circumstances surrounding Defendant's arrest do not indicate coercive conduct overbearing the will of the Defendant such that his waiver or any statements made were involuntary: the arresting agents did not use any force; the use of a swear word as an adjective during the interview was not excessive or coercive; the arresting agents informed Defendant of his <u>Miranda</u> rights; and Defendant is clearly an educated professional who was not under the influence of any alcohol or other pressures at the time of his arrest. Thus, the Court **FINDS** by a preponderance of the evidence that Defendant voluntarily waived his <u>Miranda</u> rights and made any subsequent statements voluntarily. Accordingly, the Court **DENIES** Defendant's Motion to Suppress Defendant's Statements. ECF No. 31.

## V.      CONCLUSION

For the reasons set forth herein, the Court **FINDS** that Defendant was arrested on August 24, 2016 and that probable cause existed to arrest Defendant. Accordingly, Defendant's Motion to Suppress Evidence Due to Lack of Probable Cause for Arrest is **DENIED**, ECF No. 30, and Defendant's Motion to Produce is **GRANTED**, ECF No. 30. The Government is **ORDERED** to produce, for the examination and use of Defendant, any other materials or any other statement of Special Agent John Slayton that is in Government's possession and relates to the subject matter of Special Agent Slayton's testimony. ECF No. 30.

Furthermore, the Court **FINDS** that Defendant was properly informed of his rights under <u>Miranda v. Arizona</u> following his arrest on August 24, 2016, voluntarily waived his rights, and made any subsequent statements voluntarily. Accordingly, Defendant's Motion to Suppress Defendant's Statements is **DENIED**. ECF No. 31.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED**.

/s/
Robert G. Doumar
Senior United States District Judge

UNITED STATES DISTRICT JUDGE

Norfolk, VA
November 23, 2016